SO ORDERED: September 8, 2025.



**James M. Carr**
**United States Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| AMANPREET SINGH SANDHU, | ) | Case No. 23-04190-JMC-7 |
| | ) | |
| Debtor. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |
| | ) | |
| KAMALJIT SINGH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary Proceeding No. 23-50130 |
| | ) | |
| AMANPREET SINGH SANDHU, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

This adversary proceeding came before the Court for a bench trial on December 11, 2024

(the "Trial"). Plaintiff Kamaljit Singh ("Kamaljit") was represented by counsel Brett Thomas.

Defendant/debtor Amanpreet Singh Sandhu ("Amanpreet") proceeded *pro se*. At the conclusion

of the Trial, Kamaljit was given the opportunity to file a post-trial brief tying the evidence to the

elements of each asserted basis for denying Amanpreet's discharge.

By the *Complaint Objecting to Discharge* filed by Kamljit on December 18, 2023 (Docket No. 1) (the "Complaint"), Kamaljit asserts that Amanpreet should be generally denied a discharge of his debts in the underlying bankruptcy case. The largest of those debts is his obligation to Kamaljit under a judgment (the "Judgment") entered by the Marion Superior Court. The Judgment established the liability of Amanpreet to Kamaljit in the amount of $254,591.45 as worker's compensation for injuries suffered by Kamaljit as an employee truck driver for a company for which Amanpreet was determined to be a responsible officer. The company was Sandhu Trans, Inc. ("Sandhu Trans"). Kamaljit was injured in a vehicle collision on September 21, 2019. At the time of Kamaljit's injuries, Amanpreet was apparently a vice president of Sandhu Trans and his father, Satnam Singh ("Satnam"), served as president of Sandhu Trans.

Kamaljit asserts that Amanpreet should be denied a discharge in this case pursuant to the following subsections of the Bankruptcy Code:[1]

> § 727(a)(2)(A) and (B) – transfer or concealment of property with intent to hinder, delay or defraud a creditor or an officer of the estate;
> § 727(a)(3) – failure to keep adequate financial and business records;
> § 727(a)(4)(A) and (B) – false oath, account or claim;
> § 727(a)(4)(D) – withholding documents or records; and
> § 727(a)(5) – failure to satisfactorily explain loss of assets.

Three of the five bases asserted for denying Amanpreet's discharge require that the Court determine that Amanpreet committed acts listed in those subsections with a requisite intent to frustrate the bankruptcy process by failing to be honest and forthright. It is often said that only the "honest but unfortunate" debtor is entitled to a bankruptcy discharge.

---

[1]     Unless otherwise noted, all statutory references hereinafter are to the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*

*The Trial*

The Trial continued for an approximate total of four and one-half Trial hours. Before the commencement of the Trial, the lawyers who had been representing Amanpreet in this adversary proceeding withdrew, at Amanpreet's request, because Amanpreet could not afford to continue paying their fees. Thereafter, Amanpreet chose to proceed with the Trial without counsel. (Docket Nos. 44, 45, 54, 55 and 56.)

Amanpreet had retained Ms. Nagrah to serve as a translator (to translate from English to Punjabi for matters spoken by others and to translate from Punjabi to English when Amanpreet wished to communicate with the Court). After approximately two hours and forty-five minutes of the Trial, and with notice to the Court, the translator stopped performing translation services because Amanpreet could not pay her for any additional hours. Trial proceeded with Amanpreet unassisted in interpretation of the proceedings.

Of the Trial hours, just under three hours (or about 66% of the Trial) consisted of the testimony of Amanpreet, both as he was examined by counsel for Kamaljit and as he narrated to provide evidence in his own case, as allowed by the Court. It should be noted that counsel for Kamaljit also thoroughly deposed Amanpreet in this proceeding on September 4, 2024 ("Sandhu Dep."). Amanpreet's deposition transcript that was admitted into evidence at the Trial consisted of 196 pages, not including the index or exhibits.

During and as a result of all of Amanpreet's testimony witnessed by the Court, the Court concludes that although flawed, Amanpreet's testimony is consistently truthful. The Court closely considered Amanpreet and his demeanor during the hours that he testified. The Court concludes that Amanpreet is a truthful, credible witness. The Court believes that virtually all of the flaws, gaps, inconsistencies and errors in Amanpreet's testimony are due to Amanpreet's lack

of facility with the English language and his youth, inexperience and lack of education. Amanpreet appeared to the Court to be an "honest but unfortunate" debtor.

The Court, having reviewed and considered the evidence admitted at the Trial, *Plaintiff's Post-Trial Brief* filed on January 13, 2025 (Docket No. 60) (the "Brief") and the other matters of record, having weighed the credibility of the witnesses, having heard the representations of counsel for Kamaljit, and being otherwise duly advised, now ENTERS the following findings of fact and conclusions of law as required by Fed. R. Civ. P. 52, made applicable to this adversary proceeding by Fed. R. Bankr. P. 7052.

## **FINDINGS OF FACT**

*Background Facts from Brief*

Below-numbered paragraphs 1 through 9 are general background facts of this case, extracted from the Brief.[2]  Any matter included by Kamaljit in the Brief that the Court does not accept as having been proven at Trial has been removed as indicated.

1.    Plaintiff submitted his Voluntary Petition for Individuals Filing for Bankruptcy ("Petition") on September 19, 2023.[3]  Plaintiff's Exhibit 1, p. 7.  At the time of filing, Debtor owed Plaintiff $254,591.45, which represented the majority (approximately 86%) of the $295,005.45 in unsecured claims identified in Schedule E/F: Creditor's Who Have Unsecured Claims.  Plaintiff's Exhibit 1, pp. 29; 32.  The debt owed to Plaintiff stems from a Default Judgment by the Indiana Worker's Compensation Board of Indiana (the "WC Default Judgment") against the Debtor and Sandhu Transportation Inc., which was entered on

---

[2]    Except where noted by underlining for additions and ellipses for deletion, findings 1 through 9 are included verbatim from the Brief, with no adjustment to account for typographical errors or terms defined elsewhere herein.

[3]    Amanpreet filed his bankruptcy petition on September 21, 2023.  The cited evidence shows that Amanpreet apparently signed the petition on September 19, 2023.

September 21, 2022 by Single Hearing Member, Diane Parsons, and later affirmed, on

December 16, 2022, by the full Worker's Compensation Board ("WC Affirmed Judgment").

Plaintiff's Exhibits 53 & 54.  The aforementioned judgment was domesticated in Marion

Superior Court on May 5, 2023 (the "Judgment"), only four (4) months prior to the Debtor's

filing of his Petition.  Plaintiff's Exhibit 50.  The Judgment was then amended by the Worker's

Compensation Board on May 28, 2024, and domesticated in Marion Superior Court on June 27,

2024, to include the Debtor's company, Sandhu Trans Inc. as a party.  Plaintiff's Exhibit 51.

2.      Between the WC Default Judgment and the WC Affirmed Judgment, Debtor

became the sole owner of the stock of Sandhu Trans Inc., the company his father had started in

2015 and of which the Debtor had been a Vice President since 2016.  Plaintiff's Exhibits 57, 55,

& 56.  Debtor testified under oath that he asked his father to start the business in 2016 because

the Debtor was too young to do so; he was in his early twenties.  Plaintiff's Exhibit 52, p. 57, 6-

17.  … [I]n October 2022, three months after Sandhu Trans Inc. had ceased its operations and

only one month after the WC Default Judgment was entered, … the Debtor allegedly became

100% owner of the stock.  Id, p. 55, 17-19.  Further, Debtor testified at trial that he paid no

consideration to his father or brother for their ownership in Sandhu Trans Inc.  … [T]he transfer

of Sandhu Trans Inc. and cessation thereof was done, at least in part, in the hopes that he could

… restart the business.  Id, p. 57, 24-25 – p. 58, 1- 16.

3.      Debtor testified at trial there was a decline in the trucking industry that resulted in

an inability for the business to profit and Debtor felt responsible for convincing his father and

brother to start a trucking business with him.  … Indiana Secretary of State records reflect that

the day the Debtor became 100% owner of the stock of Sandhu Trans Inc., a Company called Go

Trucking Inc. ("Go Trucking") was incorporated.  Plaintiff's Exhibits 57 & 58.  This company

shared a principal address with Sandhu Trans Inc., which was the Debtor's father's home address, and was incorporated by Jashandeep Kaur, the Debtor's sister-in-law and the wife of his brother, and former business partner, Harpreet Singh Sandhu ("Harpreet"). Exhibit 57, 58, & 52, p. 63, 20-25; p. 64, 4-15; p. 65, 7-14. Thereafter, on February 9, 2023, Night Riders, a trucking company, was incorporated by the Debtor's mother with its principal office being the Debtor's home address. Exhibits 59 & 52, p. 67, 19-25; p. 68, 1-6; 9-12. Finally, on January 24, 2024, Debtor's father, Satnam Singh Sandhu ("Satnam"), began a trucking company called USA Trans, Inc. ("USA Trans"), with its principal office address at the same principal office address of Sandhu Trans Inc., which is Debtor's father's home address. Exhibits 57, 60, & 52, p. 65, 1-14; 19-25.

4.    In Debtor's Statement of Financial Affairs, he lists Sandhu Trans Inc. as a business he owned and averred that it was a trucking business with no accounts receivable as of the date of filing (September 19, 2023), two bank accounts, with negative balances, and two trucks for which the liabilities exceed the assets. Plaintiff's Exhibit 1, p. 14. Debtor affirms that his property consists of, among other things, 100% of Sandhu Trans Inc. stock and lists two bank accounts for Sandhu Trans Inc. (2028 and 0050). Id, p. 20. Allegedly, [h]e omits an additional Sandhu Trans bank account, ending in 9896, that was opened after June 2022, when the Debtor claims the business ceased operating. Id, p. 20; Plaintiff's Exhibits 14 & 15.

5.    In addition to testifying that he "managed the company" and "did everything for it," Debtor testified that he was the record keeper for Sandhu Trans Inc. from October 2016 through when they "stopped working." Plaintiff's Exhibit 52, p. 52, 17-25 – p. 53, 1-3. Despite "managing the company" and being the record keeper, Debtor … testified that since it was a small business, there was no need to keep records. Exhibit 52, p. 50, 19-20. Regardless, Debtor

claimed that at one point Sandhu Trans Inc. had kept records which were stored in the basement but were no longer there. Id, p. 52, 2-5. … Debtor answered, under oath, in his interrogatory responses that "no documents or records have been destroyed or lost outside of the ordinary course of business since defendant became the sole owner of Sandhu Trans Inc." stock. Id, p. 78, 2-5. Plaintiff's Exhibit 20, p. 21-22.

6.     Debtor listed two semi-trucks as Property in his schedules. …  Plaintiff's Exhibit 1, p. 20.  At his deposition, the Debtor first testified, under oath, that he did not recall to whom he sold the semi-trucks, averring "I put a for-sale sign on the trucks, and people called, and I sold it to them. I don't know the names. I don't recall the names."  Plaintiff's Exhibit 52, p. 24, 22-25. … Despite his family continuing to be in the trucking industry, the Debtor testified under oath that the two trucks were not used by the companies owned by his family members.  Exhibit 52, p. 64, 8-10; p. 68, 13-15; p. 66, 5-9.  … Debtor insists that the trucks were stored at an unknown location near Harding Street and 465 and was unable to identify the owner of the location, going so far as to say he would fill out the check and have the owner fill in the name.  Id, p. 39, 22-25; p. 40, 1-12.

7.     Despite allegedly selling the semi-trucks in March 2024, Debtor failed to inform Plaintiff of the sale, and the Plaintiff only learned this information from Debtor's deposition testimony.  Exhibits 35 & 38.  Thereafter, Plaintiff requested information related to the sale of the trucks, including loan paperwork for each truck, monthly statements, lien documents, payoff amounts, UCC statements, and any other documents related to payoff of the loans or release of liens, which was the apparent compensation received for trucks in the sale.  Debtor provided only a "Bill of Sale" for each truck.  Id.  At his deposition, Debtor testified that he did not have

the Huntington Bank loan documents for the trucks but could "probably get them."  Exhibit 52, p. 25, 14-17.  …

8.      … Debtor testified regarding several "loans" taken out by Sandhu Trans Inc.  … Debtor testified that Sandhu Trans Inc., the business he was the 100% owner of <u>the stock of</u>, had an SBA loan that was still pending.  Exhibit 52, pp. 70, 25 – p. 71, 1-5.  According to Debtor, the SBA loan amount of $141,800 was transferred from his father's bank account ending in 0486 to the Sandhu Trans Inc. bank account on June 22, 2020.  Id, p. 84, 18-23.  … <u>Allegedly,</u> Debtor could not provide any information or requested documents related to the following additional loans and/or payments made on behalf of Sandhu Trans Inc. to Mercedes Benz Financial Services, Tesla Motors, Ray Skillman, Citi, Sam's Club, Chase, Kohl's, Wells Fargo, Capital One, Best Buy, JC Penny, Macy's, Home Depot, PNC Bank, Huntington Bank, Shop Your Way, Ally Financial Inc., and Citizen's State Bank.  Exhibit 20, p. 12-13.  …

9.      Debtor contends that the trucking business wasn't lucrative after the pandemic.  …  [T]he unsigned tax records indicate that Sandhu Trans Inc. had a total taxable income of $369,549 in 2021 and $412,472 in 2022.  Exhibit 6 & 10.  …  Debtor avers that the business ceased operating in June 2022.  …

<u>*Additional Facts*</u>

In addition to the background facts set forth above, the Court makes the following additional findings of fact that are material to the Court's decision.[4]

10.     On August 26, 1993, Amanpreet was born in the state of Punjab in India.

11.     In 2010, at the age of 16, Amanpreet and his family moved to the United States.  At that time, Amanpreet spoke no English.  He began speaking English only after attending

---

[4]      These facts are taken both from the evidence admitted at the Trial as well as the Sandhu Dep.

courses as a student.  He never took English courses while in India and began speaking English only when he moved to the United States.

12.     Amanpreet attended two years of high school and earned a diploma (although when asked if he received a GED or high school diploma, he seemed uncertain).  Amanpreet dropped out of college after two years because of the language barrier.  He found it difficult to understand English well enough to succeed in an academic environment.

13.     Amanpreet's first job after college was at a gas station.  He dreamed of becoming a truck driver.

14.     In 2015, Amanpreet asked his father to open a trucking company due to Amanpreet's age, fear due to his lack of familiarity with the rules and regulations, and understanding that it would be culturally disrespectful to open the business when an older family member could do it.

15.     Amanpreet's father took care of all the legal and formal aspects of getting the Sandhu Trans trucking business started.  On March 24, 2015, the articles of incorporation were approved and filed for Sandhu Trans as a business with the Indiana Secretary of State, with Satnam as its only incorporator.

16.     For the first nineteen months, Satnam was the 100% owner of the stock of Sandhu Trans.  On October 14, 2016, an amendment was filed with the Indiana Secretary of State listing Satnam as the president, Amanpreet as a vice-president and Harpreet Singh Sandhu ("Harpreet"), Amanpreet's brother, as the secretary. At that time, half of the shares were re-distributed, resulting in Satnam owning 50%, Amanpreet 25% and Harpreet 25%.  Amanpreet made no capital contribution in connection with the transfer of 25% of Sandhu Trans' stock from Satnam to Amanpreet.

17.     Since approximately 2016, Amanpreet drove a truck for Sandhu Trans.  Quite apart from the enormous language barrier, Amanpreet did not have the experience, knowledge or business acumen to run a viable business.[5]  There was no evidence that he prepared himself with knowledge of the trucking industry or prepared himself with knowledge of business ownership. Even though Amanpreet had little knowledge regarding business management or the trucking industry, Amanpreet believes he "took care" of Sandhu Trans and "did everything for it" starting in October 2016.  (Sandhu Dep. Tr., 55:17-23; 56:23-57:10.)

18.     Amanpreet believed that because Sandhu Trans was a small business, he did not need to keep detailed business records, including financial records, tax records, customer sales records, employee records and likely insurance records (based on the worker's compensation litigation).

(a)     The company did not keep financial records over time, including invoices, receipts, and cash flow statements.

(b)     Amanpreet kept some delivery bills [invoices] for the short term until he was paid for the work he completed.  He relied on his memory to determine when he needed to be paid for services rendered.

(c)     Sandhu Trans did not maintain long term financial business records.

19.     Due to his youth and inexperience, Amanpreet was naïve and trusting of others in managing the business affairs of Sandhu Trans.

(a)     Amanpreet did not have a sense of fair deals or transactions.

---

[5]     For example, during the Sandhu Dep., Amanpreet testified that the two trucks used in the Sandhu Trams business were "not owned by the company.  They were owned by the bank."  (Sandhu Dep. Tr., 24:6-18.)  When asked if the bank had a lien on the trucks, Amanpreet's response was "How do you mean by lien?" and "I don't know about that."  (Sandhu Dep. Tr., 26:19-23.)  This is emblematic of other exchanges during the Sandhu Dep. that demonstrate Amanpreet's lack of knowledge about basic business and financial principles.

(b)   Amanpreet relied on third parties for their records of important documents like tax forms and was unaware of the meaning of the terms used in forms.

(c)   Amanpreet trusted the record keeping of other businesses (for example, banks, accounts receivable factoring companies, and brokers) but did not verify the validity of their records.

(d)   Amanpreet provided documents to his tax preparer for the preparation of tax returns, but he relied on his accountant to properly prepare the returns and did not review the completed returns.

20.   Amanpreet largely relied on bank statements as Sandhu Trans' business records.[6]

21.   It is evident from the evidence admitted at the Trial that Amanpreet did not assume financial or operational control of the Sandhu Trans during the active lifetime of the business.  The evidence demonstrates that it is far more likely that his father retained control over the Sandhu Trans finances until the business collapsed.

(a)   Amanpreet lacked knowledge about certain transactions of Sandhu Trans.

(b)   Amanpreet lacked knowledge of the origins of Sandhu Trans' debts.

(c)   Satnam paid bills on behalf of Sandhu Trans.

(d)   Satnam initiated transactions and used Sandhu Trans accounts for the benefit of Sandhu Trans and other business entities.

(e)   Satnam signed Sandhu Trans' tax returns for 2021 and 2022.

(f)   On July 23, 2022, while still in ownership, Satnam paid himself $3,000 from the Sandhu Trans account.

---

[6]   Amanpreet testified at the Sandhu Dep. that "Other than bank statements, there's nothing else".  (Sandhu Dep. Tr., 126:1-3.)

(f)     Furthermore, Satnam, Harpreet and Amanpreet were all authorized users on the Sandhu Trans account.  The authorized users would from time to time use each other's bank card, so some transactions are not traceable to an individual, even if a transaction is linked to an individual's bank card.

22.     In approximately June 2022, Sandhu Trans stopped operating due to COVID, Kamaljit's lawsuit and a family misunderstanding.  Otherwise, there is no detailed information about how the business of Sandhu Trans developed and then collapsed.  Amanpreet testified at the Trial that his family members were ready to shutdown Sandhu Trans, but Amanpreet was not ready to close Sandhu Trans.

23.     On October 25, 2022, Satnam and Harpreet transferred their Sandhu Trans shares to Amanpreet, resulting in Amanpreet's owning 100% of the shares.  Even after Sandhu Trans stopped operating and Amanpreet acquired 100% ownership, Amanpreet did not obtain exclusive control over Sandhu Trans finances.

(a)     Both Satnam and Harpreet continued to use the Sandhu Trans account for their respective purposes, which means there continued to be transactions in and out of the account that were unrelated to Sandhu Trans operations.  Using the data in Trial Exhibits 3, 8, 12 and 15, Kamaljit calculates Satnam's and Harpreet's withdrawals from the Sandhu Trans account (via electronic withdrawal, debit card and other account transfers) from September 2022 through September 2023 to be more than $60,000.  (Brief, p. 10.)

(b)     RTS Financial Inc. ("RTS") is a third-party financial company that purchases unpaid invoices from drivers and pays them a percentage of the invoice after deducting a service fee.  After October 25, 2022, RTS payments on some of such invoices and possibly fuel rebates were being deposited into the Sandhu Trans account for work that was

completed under the father's leadership of Sandhu Trans.  The same may be true for other brokers, possibly including Moon Star Express and Superior Trucking.  It is also possible that such deposits were unrelated to Sandhu Trans because Satnam continued to use the Sandhu Trans account(s), rather than open a different bank account, for other businesses he operates.

(c)     In December 2022, Satnam deposited into Sandhu Trans' account payments for Satnam's work with Hub Group Trucking that is apparently unrelated to Sandhu Trans.

24.     At no point from Sandhu Trans' inception, including after Amanpreet became the owner of 100% of the stock of Sandhu Trans, did Amanpreet exercise exclusive control over Sandhu Trans, its operations, finances or accounts.

25.     At no time during the Trial did Kamaljit introduce evidence to establish the precise authority of Amanpreet over Sandhu Trans during the relevant periods of time.

26.     Satnam, Harpreet and Amanpreet did not respect corporate formalities with respect to Sandhu Trans.  It is difficult to decipher from the bank statements which deposits and withdrawals solely related to Sandhu Trans.

27.     Amanpreet testified that after Sandhu Trans stopped operating, he has not worked. This is reflected in his *Statement of Financial Affairs* (Bankruptcy Case Docket No. 1) ("SOFA").  From September 19, 2022 to the present, Amanpreet relied on others to provide financial support, including his father, family and friends.  Amanpreet requested funds from his father, at least some of which Amanpreet characterized as loans that had not been repaid. Amanpreet did not disclose in *Schedule I: Income* (Bankruptcy Case Docket No. 1) ("Schedule I") or in his SOFA the funds he received before filing his bankruptcy petition from his father, family and friends.

28.     Amanpreet relied on his wife for business and language help and to manage their household finances.

29.     Amanpreet began investing in cryptocurrencies in the 2019-21 timeframe. Amanpreet's bankruptcy schedules list a Robinhood crypto account with a value of $0, and Amanpreet also had Binance, Crypto.com, and Trust Wallet accounts.

30.     Amanpreet's tax preparer testified that Amanpreet told him that Amanpreet had losses in cryptocurrencies. Amanpreet's tax returns admitted into evidence at Trial do not include IRS Form 8949 with respect thereto.

31.     Amanpreet's bank statements reflect transfers into and out of his cryptocurrency accounts. Amanpreet provided statements from September 2022 through February 2024 for his Robinhood account, as well as other cryptocurrency documents. (Trial Exs. 23, 24, 25 and 26.) Amanpreet did not otherwise provide to Kamaljit any substantive documents related to his cryptocurrency accounts detailing transfers, conversions or transactions.

32.     In September 2023, Amanpreet transferred $946.44 from one of his cryptocurrency accounts to his wife for the payment of household expenses.

33.     Statements made by Amanpreet during the Sandhu Dep. and at Trial demonstrate that his failings with regard to maintenance of business records are virtually all due to misunderstandings by Amanpreet of business terms and other language-based errors. Throughout these proceedings, it has become clear that Amanpreet does not have an adequate grasp on the English language to effectively transact business or respond fully to charges made against him. While his use of the language was sufficient to conduct a conversation, he demonstrated extreme limits in his ability to understand and communicate matters in the business or legal context.

## CONCLUSIONS OF LAW

The Court makes the following conclusions of law:

A.      Any finding of fact above will also be a conclusion of law, and any conclusion of

law will also be a finding of fact, to support the judgment of the Court.

B.      This Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1334 and 157.

C.      This adversary proceeding is a core proceeding pursuant to 28 U.S.C.

§ 157(b)(2)(J).

D.      Venue is proper in this matter pursuant to 28 U.S.C. §§ 1408 and 1409.

E.      Plaintiff seeks a denial of Amanpreet's discharge in the underlying Bankruptcy

Case pursuant to §§ 727(a)(2)(A) and (B), (a)(3), (a)(4)(A) and (B), (a)(4)(D) and (a)(5).

F.      Section 727(a) provides, in relevant part:

The court shall grant the debtor a discharge, unless –
> …
> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of
> the estate charged with custody of property under this title, has transferred,
> removed, destroyed, mutilated, or concealed, or has permitted to be transferred,
> removed, destroyed, mutilated, or concealed –
> > (A) property of the debtor, within one year before the date of the filing of
> > the petition; or
> > (B) property of the estate, after the date of the filing of the petition;
> (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or
> preserve any recorded information, including books, documents, records, and
> papers, from which the debtor's financial condition or business transactions might
> be ascertained, unless such act or failure to act was justified under all of the
> circumstances of the case;
> (4) the debtor knowingly and fraudulently, in or in connection with the case –
> > (A) made a false oath or account;
> > (B) presented or used a false claim;
> > …
> > (D) withheld from an officer of the estate entitled to possession under this
> title, any recorded information, including books, documents, records, and papers,
> relating to the debtor's property or financial affairs;
> (5) the debtor has failed to explain satisfactorily, before determination of denial of
> discharge under this paragraph, any loss of assets or deficiency of assets to meet
> the debtor's liabilities … .

G.        "Consistent with the 'fresh start' policy underlying the Code, these [§ 727(a)] exceptions to discharge should be construed strictly against the creditor [Kamaljit] and liberally in favor of the debtor. It is also important, however, to recognize that a discharge in bankruptcy is a privilege, not a right, and should only inure to the benefit of the honest debtor." *Matter of Juzwiak*, 89 F.3d 424, 427 (7th Cir. 1996) (internal citations omitted). "The denial of discharge is a harsh remedy to be reserved for a truly pernicious debtor." *Soft Sheen Prods., Inc. v. Johnson (In re Johnson)*, 98 B.R. 359, 367 (Bankr. N.D. Ill. 1988) (citation omitted).

H.        The grounds for denial of discharge under § 727(a) must be established by a preponderance of the evidence. *Peterson v. Scott* (*In re Scott*), 172 F.3d 959, 966–67 (7th Cir. 1999).

I.        "[I]t remains within the discretion of a bankruptcy court to grant a discharge even when grounds for denial of discharge are demonstrated to exist." *Union Planters Bank, N.A. v. Connors*, 283 F.3d 896, 901 (7th Cir. 2002) (quoting *In re Hacker*, 90 B.R. 994, 997 (W.D. Mo. 1987)).

J.        Kamaljit argues that Amanpreet and his family have taken steps to ensure that Kamaljit does not collect on the Judgment.  Specifically, after the Judgment was entered, Sandhu Trans stopped operating, Amanpreet's family members set up other business entities to continue to work in the trucking industry,[7] all with the effect of fraudulently frustrating Kamaljit's efforts to collect on the Judgment.  He further argues that the family financially supported Amanpreet from their trucking business operating through the newly established business entities such that Amanpreet did not have wages or assets that could be garnished, attached or liquidated to pay the

---

[7]        Though not explicitly stated, the Court presumes the inherent meaning to be that Sandhu Trans' former business was redirected to the business entities newly established by Amanpreet's family members.

Judgment but could continue to live his pre-petition lifestyle.  (Brief, pp. 13-14, 17-18.)  Certain

of those facts are supported by evidence in the record (such as the formation of business entities

substantiated with the Indiana Secretary of State's records); others are not.  The leap from the

picture Kamaljit paints with circumstantial evidence to a conclusion of Amanpreet's fraudulent

intent[8] is not justified.

*§ 727(a)(2)(A) and (B)*

      K.     In Count I of his Complaint, Kamaljit asserts that the Court should deny

Amanpreet a discharge under § 727(a)(2)(A) and (B).  Generally, Kamaljit alleges that

Amanpreet, "with intent to hinder, delay, or defraud [Kamaljit] or with reckless indifference for

the truth, transferred, removed and/or concealed personal property."  (Complaint, p. 7.)  Kamaljit

focuses on Satnam's and Harpreet's withdrawals from the Sandhu Trans account(s) in support of

Count I and Debtor's "allow[ing]" such withdrawals to be made.  (Brief, pp. 8-11.)

      L.     Denial of discharge under [§ 727(a)(2)(A)] requires proof of actual intent
to hinder, delay, or defraud a creditor.  *In re Snyder,* 152 F.3d 596, 601 (7th
Cir.1998); *In re Krehl,* 86 F.3d 737, 743 (7th Cir.1996); *In re Smiley,* 864 F.2d
562, 566 (7th Cir.1989).  "[P]roof of harm is not a required element of a cause of
action under Section 727."  *Id. at* 569.  In determining whether a debtor has acted
with intent to defraud under § 727, the court should consider the debtor's "whole
pattern of conduct."  *In re Ratner,* 132 B.R. 728, 731 (N.D.Ill.1991) (*quoting In re
Reed,* 700 F.2d 986 (5th Cir.1983)).  The issue of a debtor's intent is a question of
fact to be determined by the bankruptcy judge.  *See Smiley, supra,* 864 F.2d at
566. Actual fraudulent intent can be inferred from extrinsic evidence.  *Id.; Krehl,
supra,* 86 F.3d at 743; *In re White,* 63 B.R. 742, 744 (Bankr.N.D.Ill.1986) ("a
debtor is unlikely to directly testify that his intent was fraudulent, the court may
deduce fraudulent intent from all the facts and circumstances of a case").  "Thus,
where the evidence on the intent question is such that two permissible conclusions
may rationally be drawn, the bankruptcy court's choice between them will not be
viewed as clearly erroneous."  *Krehl, supra,* 86 F.3d at 744 (citation omitted).
"Intent to defraud involves a material misrepresentation that you know to be false,
or, what amounts to the same thing, an omission that you know will create an

---

[8]     The actions, omissions and intent of Sandhu Trans, Satnam and/or Harpreet are part of the circumstantial
evidence Kamaljit relies on to argue that Amanpreet is not entitled to a discharge, but the Court's ultimate
determination rests with the intent of only Amanpreet.

erroneous impression." *In re Chavin,* 150 F.3d 726, 728 (7th Cir.1998) (citations omitted).

*Richardson v. Clarke (In re Clarke)*, 332 B.R. 865, 870 (Bankr. C.D. Ill. 2005).

M.    "In order to prevail against a debtor on a § 727(a)(2)(A) claim, a plaintiff must prove two things: (a) the debtor transferred, removed, destroyed, mutilated, or concealed property and, if proven, (b) that the debtor had an intent to hinder, delay, or defraud his creditors." *Id.*

N.    "The purpose of [§ 727(a)(2)(B)] is to deny a discharge to debtors who fail to disclose transactions regarding their assets subsequent to the filing of the bankruptcy petition." *Id.* at 871 (*citing In re Wolmer,* 57 B.R. 128 (Bankr. N.D. Ill.1986)).

O.    The time period implicated by § 727(a)(2)(A) and (B) begins on September 21, 2022. At that time, Amanpreet owned 25% of the stock of Sandhu Trans. It would be just over a month later, on October 25, 2022, when Amanpreet became the owner of 100% of Sandhu Trans stock. Citing authority from the Second, Fifth and Ninth Circuits, Kamaljit argues that he established Amanpreet's *prima facie* fraudulent intent because the subject transfers were made to Amanpreet's family members gratuitously (Brief, pp. 9-10) and that, when the burden shifted to Amanpreet, he failed to demonstrate that he did not have fraudulent intent. The Court disagrees. The transfers at issue are transfers from the Sandhu Trans account(s), not Amanpreet's personal accounts. As noted in the Findings of Fact above, Amanpreet did not have exclusive control over Sandhu Trans' business and finances, even after he became owner of 100% of its stock. Amanpreet did not have the level of control over Sandhu Trans, its operations, finances or account(s), necessary to find that he "allowed" his father or brother to transfer funds from

Sandhu Trans to themselves as Kamaljit suggests.[9]  This statement should not be taken as the Court's "sanctioning" or "approving of" such transfers.  Rather, the question before the Court is whether Amanpreet's discharge should be denied.  To rule, the Court must look at Amanpreet's intent.  Based on the evidence admitted at Trial of all the facts and circumstances, the Court concludes that the subject transfers were not accomplished by action (or omission) taken by Amanpreet with the requisite mental state, *e.g.*, an "intent to hinder, delay, or defraud a creditor".  Therefore, Amanpreet's discharge will not be denied pursuant to § 727(a)(2)(A) and (B).

*§ 727(a)(3)*

P.      In Count II, Kamaljit asserts that Amanpreet should be denied a discharge under § 727(a)(3) because Amanpreet "has concealed, falsified, or failed to keep or preserve recorded information from which his financial and business transactions might be ascertained." (Complaint, p. 8.)  Kamaljit focuses on Amanpreet's failure to maintain adequate records with respect to (a) transfers between the Sandhu Trans accounts and his personal accounts; (b) Amanpreet's expenses; (c) funds given or loaned to him by family and friends; (d) Sandhu Trans' trucks; and (e) cryptocurrencies.  (Brief, pp. 11-16.)

Q.      "The purpose of § 727(a)(3) is 'to make the privilege of discharge dependent on a true presentation of the debtor's financial affairs.' "  *Scott*, 172 F.3d at 969 (citation omitted).  As a precondition to discharge, debtors are required to "produce records which provide creditors 'with enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present.' " *Juzwiak*, 89 F.3d at 427 (quotations omitted).  "Records need not be kept in any special manner, nor is there any rigid standard of perfection in record-keeping mandated by § 727(a)(3).  On the

---

[9]      Kamaljit acknowledges that Sandhu Trans "was clearly run by [Amanpreet's] father."  (Brief, p. 18.)

other hand, courts and creditors should not be required to speculate as to the financial history or condition of the debtor, nor should they be compelled to reconstruct the debtor's affairs." *Id*. at 428 (internal citations omitted). "The completeness and accuracy of a debtor's records are to be determined on a case-by-case basis, considering the size and complexity of the debtor's financial situation." *4820 & 4901, Ltd. v. Tesler (In re Tesler),* 647 B.R. 710, 720 (Bankr. N.D. Ill. 2023) (quoting *Baccala Realty, Inc. v. Fink (In re Fink)*, 351 B.R. 511, 522–23 (Bankr. N.D. Ill. 2006)). Intent is not a requisite element for denying a discharge under § 727(a)(3). *Scott*, 172 F.3d at 969.

R.      Amanpreet's presentation of his financial affairs need not be perfect, but it had to provide enough information so that creditors would not have to guess at or wholly reconstruct Amanpreet's financial affairs themselves. The Court finds itself balancing the competing interests by deciding whether Amanpreet provided "*enough* information to ascertain the debtor's financial condition and track his financial dealings with *substantial* completeness and accuracy for a *reasonable* period past to present." *Juzwiak*, 89 F.3d at 427 (emphasis added).

S.      Kamaljit did not assert, and there is no evidence to suggest, that Amanpreet concealed or falsified documents. Thus, the inquiry focuses on whether he failed to keep or preserve recorded information to the detriment of Kamaljit's ability to ascertain Amanpreet's financial condition which was not justified under all of the circumstances.

T.      Amanpreet was not a "role model" for record keeping. The evidence indicates that Amanpreet largely relied on bank records. The bank records admitted at Trial reflect Amanpreet's and Sandhu Trans' financial transactions. They present a picture consistent with Amanpreet's testimony – he did not have control over Sandhu Trans' finances; his wife primarily controlled their household finances; when he needed money to cover his expenses, he asked his

father and, later, other family members and friends; and he invested in cryptocurrencies as described in the bank statements and cryptocurrency account statements and incurred losses with respect thereto.  The Court concludes that, under the circumstances,[10] Kamaljit has failed to sustain his burden of proof to demonstrate that Amanpreet's financial condition could not be ascertained because he failed to keep or preserve recorded information.  Therefore, Amanpreet's discharge will not be denied pursuant to § 727(a)(3).

*§ 727(a)(4)(A) and (B)*

U.       In Count III of the Complaint, Kamaljit alleges that Amanpreet has "knowingly and fraudulently, in or in connection with the case [] made a false oath or account [or] presented or used a false claim."  (Complaint, p. 8.)  In the Brief, Kamaljit directs the Court to Amanpreet's alleged "false oath or account regarding his financial situation by including in his schedules income levels far below the amount of transfers he received from his business, Sandhu Trans Inc., in 2021 and 2022."  (Brief, p. 17.)   While less clear, it appears that the "false claim" is that Debtor "is not working and that he is destitute [while] his father and brother continue to pay his bills and allow him to enjoy the same lifestyle he lived prior to filing".  (Brief, p. 17.)

V.       "The purpose of § 727(a)(4) is to enforce a debtor's duty of disclosure and to ensure that the debtor provides reliable information to those who have an interest in the administration of the estate."  *Clarke*, 332 B.R. at 872 (citing *In re Carlson,* 231 B.R. 640, 655 (Bankr. N.D. Ill. 1999), *aff'd* 250 B.R. 366 (N.D.Ill.2000), *aff'd* 263 F.3d 748 (7th Cir. 2001)).

---

[10]       Given his youth, inexperience, language difficulties, and lack of education, the Court is convinced that any inaccuracies or gaps in Amanpreet's recollection of events or failure to produce identifiable records was not attributable to any effort on Amanpreet's part to frustrate any creditor in its efforts to ascertain Amanpreet's financial condition.

W.     In order to prevail, Kamaljit must establish five elements:  "(1) [Amanpreet] made a statement under oath; (2) the statement was false; (3) [Amanpreet] knew that the statement was false; (4) [Amanpreet] made the statement with intent to deceive; and (5) the statement related materially to the bankruptcy case."  *Id.* (citation omitted).

X.     To find the requisite degree of fraudulent intent, the court must find that the debtor knowingly intended to defraud or engaged in such reckless behavior as to justify a finding of fraud.  Direct evidence of intent to defraud may not be available.  Instead, intent may be inferred from circumstantial evidence or by inference based on a course of conduct.  Reckless disregard means "not caring whether some representation is true or false ... ."  If a debtor's bankruptcy schedules reflect a "reckless indifference to the truth" then the plaintiff seeking denial of the discharge need not offer any further evidence of fraud.

*Trennepohl v. Neal (In re Neal),* 2009 WL 684793 at *2 (Bankr. S.D. Ind. 2009) (internal citations omitted).

Y.     "[A] fact is material 'if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property.' "  *Stamat v. Neary*, 635 F.3d 974, 982 (7th Cir. 2011) (quotation omitted).

Z.     In Schedule I, Amanpreet listed his employment status as "Not employed" and his income as $0 on the line items for "gross wages, salary, and commissions", "Family support payments that you … regularly receive",[11] and "Other monthly income".  His SOFA reflects a "no" answer to the question "Did you receive any other income during this year or the two previous calendar years?"  Thus, the salient points in the Court's analysis under § 727(a)(4)(A) and (B) are Amanpreet's understanding of the word "income" and whether he knowingly and falsely stated his income and employment status under oath in Schedule I and the SOFA with the

---

[11]     The description of such family support payments on the official form includes "alimony, spousal support, child support, maintenance, divorce settlement, and property settlement", none of which apply in this scenario given that there is no evidence that Amanpreet has gone through a marital dissolution proceeding.

intent of defrauding his creditors.  The evidence fails to prove both that Amanpreet knew his statements were false and that Amanpreet made such statements in an effort to defraud creditors. The word income is defined in Merriam-Webster's online dictionary as "a gain or recurrent benefit usually measured in money <u>that derives from capital or labor</u>".  *Income*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/income (last visited July 28, 2025) (emphasis added).  Given Amanpreet's limited proficiency beyond conversational English and based on the evidence admitted at Trial, the Court cannot conclude that Amanpreet believed that funds received as loans or gifts from his family members and friends may qualify as "income" to be disclosed in Schedule I and the SOFA.  Kamaljit did not controvert Amanpreet's statements in Schedule I or the SOFA or at Trial that Amanpreet was not working at the time he filed his bankruptcy petition.  Moreover, even if Amanpreet knew the loans or gifts were "income" to be disclosed, Kamaljit  provided no evidence that Amanpreet intended to deceive his creditors by scheduling $0 income.  It appears to the Court that Amanpreet has been honest about the source(s) of funds to pay his bills since Sandhu Trans stopped operating.  Based upon the evidence admitted at the Trial and the Court's assessment of Amanpreet's credibility as a witness, the Court concludes that Kamaljit has not sustained his burden of proof with respect to Count III. Therefore, Amanpreet's discharge will not be denied pursuant to § 727(a)(4)(A) or (B).

*§ 727(a)(4)(D)*

      AA.    In Count IV, Kamaljit alleges that Amanpreet "has knowingly and fraudulently, in connection with this matter, withheld documents and records related to his cryptocurrency accounts from the Trustee".  (Complaint, p. 9.)  The Brief does not specifically address Count IV.

      BB.    One court explained the purpose of § 727(a)(4)(D) as follows:

> Trustees lack the time and resources to play detective and uncover all assets and transactions of their debtors.  Debtors in bankruptcy have an affirmative duty to

surrender to the Trustee all recorded information relating to property of estate, and are also obligated to cooperate by providing the Trustee with all relevant documents and papers and fully answering the questions in the petition for relief and attached schedules. Section 727(a)(4)(D) enforces this obligation by denying discharge to debtors who intentionally withhold records, books, documents, or other papers relating to their property or financial affairs. The requisite intent to act knowingly and fraudulently may be established by circumstantial evidence, or by inference drawn from a course of conduct.

*Tesler*, 647 B.R. at 723-24 (quoting *Clark v. Tieszen (In re Tieszen)*, No. 98 B 27403, 1999 WL 669263, at *7 (Bankr. N.D. Ill. Aug. 24, 1999) (citations and quotations omitted)).

CC.     Kamaljit's focus here is on Debtor's investments in "cryptocurrency". The relevant inquiry is whether Amanpreet withheld cryptocurrency-related documents from the chapter 7 trustee. Taking judicial notice of the docket of the underlying bankruptcy case, the Court sees no indication from the trustee that she was unable to perform her statutory duties based on an alleged withholding of documents or that she attempted to pursue documentation via a motion for turnover or a Fed. R. Bankr. P. 2004 examination and was thwarted in her efforts by Amanpreet. Kamaljit has provided no specific evidence that Amanpreet withheld documents, let alone withheld documents knowingly and fraudulently. Accordingly, the Court concludes that Kamaljit has failed to sustain his burden of proof on Count IV. Therefore, Amanpreet's discharge will not be denied pursuant to § 727(a)(4)(D).

*§ 727(a)(5)*

DD.     In Count V, Kamaljit asserts that Amanpreet "has failed to provide a satisfactory explanation regarding any loss of assets or deficiency of assets to meet [Amanpreet's] liabilities". (Complaint, p. 10.) Kamaljit draws the Court attention to the transfer of Sandhu Trans' trucks (sale proceeds of which are $34,732.50) and Amanpreet's cryptocurrency accounts ($10,000 which, if invested as Kamaljit suggests, would be worth $58,774). (Brief, pp. 19-20.)

EE.    "Section 727(a)(5) is broadly drawn and clearly gives a court broad power to decline to grant a discharge in bankruptcy where the debtor does not adequately explain a shortage, loss, or disappearance of assets." *First Federated Life Ins. Co. v. Martin (In re Martin)*, 698 F.2d 883, 886 (7th Cir. 1983) (citations omitted). "By penalizing a debtor who is insufficiently forthcoming about what happened to his assets, section 727(a)(5) is one of several [Bankruptcy] Code provisions meant to 'relieve [] creditors and courts of the full burden of reconstructing the debtor's financial history and condition, placing it instead upon the debtor.' " *Cohen v. Olbur* (*In re Olbur*), 314 B.R. 732, 740 (Bankr. N.D. Ill. 2004) (citation omitted). "Courts are not concerned with the wisdom of a debtor's disposition of assets but, instead, focus on the truth, detail, and completeness of the debtor's explanation of the loss." *Structured Asset Servs., L.L.C. v. Self (In re Self)*, 325 B.R. 224, 250-51 (Bankr. N.D. Ill. 2005) (citing *In re D'Agnese*, 86 F.3d 732, 734 (7th Cir. 1996)).

> FF.    There are two stages of proof under § 727(a)(5).  First, the party objecting to discharge has the burden of proving that the debtor at one time[12] owned substantial and identifiable assets that are no longer available for his creditors.  Second, if the party objecting to the discharge meets that burden, then the debtor is obligated to provide a satisfactory explanation for the loss.  What constitutes a satisfactory explanation for § 727(a)(5) purposes is left to the discretion of the court.  A debtor's explanation must consist of more than the vague, indefinite, and uncorroborated hodgepodge of financial transactions ... .  Instead it must be a good faith explanation of what really happened to the assets in question.

*Self*, 325 B.R. at 250-51 (internal quotations and citations omitted).  It is not "necessary for the debtor to justify 'the wisdom of the … disposition of assets.'  What is relevant is 'the completeness and truth' of his explanation." *Olbur*, 314 B.R. at 741 (internal citations omitted).

---

[12]    "The inquiry under § 727(a)(5) is not limited to events or transactions that have occurred within a specified number of months or years before the bankruptcy filing." *Self*, 325 B.R. at 250 (citation omitted).  "Section 727(a)(5) itself prescribes no limitations period, but courts have held that the assets in question must at least have belonged to the debtor 'at a time not remote in time to case commencement.' " *Olbur*, 314 B.R. at 741 (citations omitted).  The exact time a court should look back "depends on the case; there is no hard and fast rule." *Id.* (citation omitted).

GG.     The first stage of proof required for Kamaljit to prevail on its claim under § 727(a)(5) is that Amanpreet owned substantial and identifiable assets that are no longer available for Kamaljit.  It is true that the trucks (owned by Sandhu Trans, not Amanpreet)[13] and the funds invested in cryptocurrency are no longer available to pay creditors.  However, the Court finds Amanpreet's explanation as to the disposition of such assets to be satisfactory. Kamaljit acknowledges that Amanpreet explained that the trucks were sold and provided a bill of sale for each.  (Brief, p. 20.)  Amanpreet further explained that he lost most of the funds he invested in cryptocurrency and transferred $946.44 from one of his cryptocurrency accounts to his wife for the payment of household expenses.  The Court is convinced that Amanpreet testified truthfully at Trial regarding these assets.  Because Amanpreet is not required to justify the wisdom of his sale of the trucks or his investment in cryptocurrency, and because the Court is required to focus on the truth and completeness of Amanpreet's explanation, the Court concludes that Amanpreet has satisfactorily explained the disposition of Sandhu Trans' trucks and the funds invested in cryptocurrency.  Therefore, Amanpreet's discharge will not be denied pursuant to § 727(a)(5).

## **DECISION**

For the reasons described above, the Court concludes that Kamaljit has not met his burden to prove that Amanpreet's discharge should be denied pursuant to §§ 727(a)(2)(A) and (B), (a)(3), (a)(4)(A) and (B), (a)(4)(D) and (a)(5).  To the extent the Court is vested with discretion, the Court exercises such discretion under the facts and circumstances of this proceeding to provide Debtor with a full discharge in the underlying bankruptcy case.

---

[13]     Again focusing on corporate formalities, the Court questions whether the proceeds from the sale of Sandhu Trans' trucks would have been available to pay Amanpreet's creditors.  The evidence suggests that the sale proceeds from the trucks would have been paid to the creditor with a lien against them.

The Court will enter judgment in favor of Amanpreet and against Kamaljit consistent with these findings of fact and conclusions of law contemporaneously herewith and grant Amanpreet a discharge in the underlying bankruptcy case.

### ###